**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, John Ryan Anthony, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of an applications under Rule 41 of the Federal Rules of Criminal Procedure authorizing the search of: (a) a White Toyota Tacoma bearing license plate "UAC887", hereinafter the "SUBJECT VEHICLE"; and (b) the person of DALTON RAY MULLIS, hereinafter MULLIS, or the "SUBJECT" as described in greater detail in Attachments A-1 and A-2, respectively. The search warrants would authorize the search of the SUBJECT VEHICLE, MULLIS, and electronic devices (as defined in greater detail below) found within the SUBJECT VEHICLE and/or on or near MULLIS, to locate and seize, as described in Attachments B-1 and B-2, respectively, evidence, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing violations of the below-described "Subject Offense."

2. I am an investigative law enforcement officer of the United States who is authorized by law to conduct investigations and to make arrests for offenses enumerated in Title 18 of the United States Code. I am a Special Agent with the Federal Bureau of Investigation (the "FBI") assigned to the Charlotte Field Office.

3. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since October 2024. I am currently assigned to Charlotte Field Office's Joint Terrorism Task Force. Among other things, I am responsible for conducting national security investigations of potential violations of federal criminal laws as a member of the Joint Terrorism Task Force. I have participated in all aspects of criminal investigation including conducting surveillance, analyzing

information obtained from court-ordered electronic service providers and analyzing telephone toll information obtained from subpoenas issued by the FBI. Prior to becoming an FBI Special Agent, I served approximately seven years on active duty as a Captain in the United States Marine Corps, holding multiple leadership positions, including Company Commander. I attended Marine Corps University and various professional military education schools where instruction focused heavily on counterinsurgency operations and the tactics, techniques, and procedures employed by Foreign Terrorist Organizations ("FTOs"). Through this training and subsequent operational assignments, I gained extensive experience operating in high-threat environments and countering threats posed by FTOs. I have also received training on indicators, behaviors, and tactics associated with homegrown violent extremism within the United States.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that located on the property described in Attachments A-1 and A-2 are items described in Attachments B-1 and B-2, that is, evidence, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing violations of 18 U.S.C. § 247(c),[1] damage to religious property; obstruction of persons in the free exercise of religious beliefs (the "Subject Offense").

5. The facts described in this affidavit are based on my own knowledge, information I know based on my training and experience, as well as information relayed to me by other law enforcement agents and individuals involved in this investigation. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are

---

[1] Title 18, United States Code, Section 247(c) provides: "Whoever intentionally defaces, damages, or destroys any religious real property because of the race, color, or ethnic characteristics of any individual associated with that religious property, or attempts to do so, shall be punished" as provided in § 247(d).

necessary to establish probable cause to believe that contraband and evidence of violations of 18 U.S.C. § 247(c) are located in the property described in Attachments A-1 and A-2.

## PROBABLE CAUSE

6. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that the property described in Attachments A-1 and A-2 contain evidence, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing the Subject Offense.,

A. Facts and Circumstances of this Case

7. During the evening hours of January 19, 2026, an individual later identified as the SUBJECT, Dalton Ray MULLIS, traveled to the Jewish Community Center located at the Foundation of Shalom Park,[2] (hereinafter "Shalom Park") in Charlotte, North Carolina. The Shalom Park complex includes facilities used for Jewish religious worship, education, and community activities, including the Jewish Community Center, the Charlotte Jewish Day School ("CJDS"), and a Holocaust Memorial. The SUBJECT vandalized multiple locations on the property including CJDS, the Holocaust Memorial, and an employee building by affixing antisemitic flyers. The flyers depicted a noose, a swastika, and a Totenkopf or "death's head," which I know to be historically associated with the German Nazi party and SS, and contained the message: "Whether you swing to the left or whether you swing to the

---

[2] The Foundation of Shalom Park is a 54-acre campus located at 5007 Providence Road, Charlotte, North Carolina. Shalom Park owns the land, buildings, and permanent structures on the campus—excluding the two synagogues located within the property. These facilities are occupied by multiple 501(c) non-profit organizations that operate Jewish religious, cultural, and educational programs. Shalom Park provides these organizations with safety and security services, landlord support, and administrative policies. The campus functions as a communal Jewish setting dedicated to religious practice, education, and community life. Approximately 6.6% of individuals affiliated with Shalom Park reside in six states outside North Carolina. Shalom Park is also home to the Charlotte Jewish Day School and Charlotte Jewish Pre-School, which provide academic instruction and Jewish religious education.

right we will simplify [sic] swing you by the neck," along with the phrase "Join your local Nazis." (Fig. 1).




Fig. 1

8. At approximately 11:44 P.M. on January 19, 2026, Shalom Park surveillance cameras captured the SUBJECT, dressed in a black jacket, dark color pants, black boots, a black beanie with a white logo, and carrying a backpack, walking from the Shalom Park Holocaust Memorial towards CJDS (Fig. 2). The SUBJECT appears to place the backpack on the ground outside the camera's field of view and retrieve an object consistent in size and shape with an adhesive spray can, along with a flyer resembling the one shown in Fig. 1. The SUBJECT is

then observed spraying one of the entrances to CJDS with what appears to be adhesive spray and placing the flyer (Fig. 1) onto the door (Fig. 3).



Fig. 2



Fig. 3

9. After affixing the flyer to the school entrance, the SUBJECT appears to return to the location where the backpack was placed and retrieves a cellular telephone. The surveillance footage shows the SUBJECT returning to the school entrance and appearing to use the device to

take photographs of the flyer on the door (Fig. 4). The SUBJECT is then seen placing yellow and black adhesive tape at the top of the flyer before departing the Charlotte Jewish Day School area.



Fig. 4

10. Based on my training and experience, individuals who commit ideologically motivated crimes and similar offenses frequently carry and use their cellular telephones during the commission of the offense, including navigating to and from the target location and to document their actions. The use of a cellular telephone in this manner typically generates historical location records—such as GPS based data or other network-based location information—maintained by the service provider or associated location services.

11. On January 19, 2026, at approximately 11:35 P.M., a Charlotte Department of Transportation (CDOT) traffic camera recorded a white, single cab pickup truck, with a white truck cap, appearing to be the same make, model, and description as the SUBJECT VEHICLE, turning onto the roadway leading to the Foundation of Shalom Park. At approximately 11:59 P.M., that same evening, the same CDOT camera recorded what appears to be the same

SUBJECT VEHICLE departing the area of the of Shalom Park. License Plate Readers (LPR) were not able to capture the Subject Vehicle's license plate as it appeared to be concealed.

12. The FBI obtained continuous CDOT camera footage from January 19, 2026. This footage shows what appears to be the SUBJECT VEHICLE traveling through the intersection of Billy Graham Parkway and Boyer Street at approximately 11:15 P.M., and later traveling through the intersection of Providence Road and Rea Road at approximately 11:59 P.M. (Fig. 5)



Fig. 5

13. On January 28, 2026, the Charlotte-Mecklenburg Police Department ("CMPD") obtained an order from the Mecklenburg County Superior Court directing telecommunications providers to produce transaction records related to cellular telephone calls, direct connect communications, SMS and/or data calls routed through cellular towers in three relevant areas on January 19, 2026, during the following timeframes:

a. Between 11:05 P.M. and 11:25 P.M. for cellular towers in the vicinity of 5321 Old Dowd Road, Charlotte, NC 28208;

b. Between 11:30 P.M. and 11:50 P.M. for cellular towers in the vicinity of 5007 Providence Road, Charlotte, NC 28226; and

c. Between 11:55 P.M. and 12:05 A.M. for cellular towers in the vicinity of 6700 Providence Road, Charlotte, NC 28226.

14. These locations and time windows identify the specific cellular towers the SUBJECT's phone likely connected to as it moved across Charlotte on January 19, 2026. Furthermore, it appears to correspond to and corroborate the direction of travel that was previously identified from CDOT traffic cameras.

15. On February 17, 2026, the FBI received from CMPD telecommunications records obtained in response to the January 28, 2026, Mecklenburg County Superior Court order (referenced in paragraph 12, above). The FBI's Cellular Analysis Survey Team ("CAST") analyzed those records and determined that telephone number **704-593-8143**, which the investigation has confirmed to be associated with an Apple iPhone registered to MULLIS as described below, transmitted data through all three sets of cellular towers during the above timeframes. In other words, the SUBJECT's phone was located in each of the relevant geographic areas at the relevant times corresponding to the movements of the SUBJECT's vehicle before, during, and after the incident at the Foundation of Shalom Park.

16. Business records provided by AT&T confirmed the user of the **704-593-8143** number referenced in the above paragraph to be MULLIS. Subsequent database checks using LexisNexis associated this number with Dalton Ray MULLIS, date of birth February 26, 2002. Open-source research further showed that the number is also associated with a CashApp account displaying the name "D.R. Mullis" and a Snapchat account displaying the name "D.R. Mullis." Based on my training and experience, the use of the initials "D.R." in both accounts is consistent with an effort to partially obscure the Subject's full name, "Dalton Ray MULLIS."

17. Employment record checks revealed that the Subject is employed by G2 Secure Staff LLC at Charlotte Douglas International Airport. Business records provided by Charlotte Douglas International Airport list the Subject's contact telephone number as **704-593-8143**, the same identified by AT&T. Those records also indicate that the Subject's parking credentials are associated with a white Toyota Tacoma bearing South Carolina license plate "UAC887."

18. South Carolina Department of Motor Vehicles indicate that license plate "UAC887" is registered to the SUBJECT VEHICLE, a 2013 white Toyota Tacoma in the name of Dalton Ray MULLIS. License plate reader ("LPR") database checks for "UAC887" showed a hit on February 2, 2026, that appears visually consistent with the SUBJECT VEHICLE captured in CDOT footage (Fig. 6), including the white, single cab configuration and white truck cap seen leaving the area of the Foundation of Shalom Park (Fig. 5).



Fig. 6.

19. At approximately 4:20 P.M., on January 19, 2026, Charlotte Douglas International Airport security records indicate the Subject Vehicle entering the employee parking lot bearing license plate "UAC887." Security cameras recorded the SUBJECT entering the airport at approximately 4:30 P.M. The SUBJECT was wearing a black beanie, a yellow and black

jacket, dark color pants, and black boots (Fig. 7). The SUBJECT's boots and beanie appear consistent with those worn by the SUBJECT captured in Shalom Park surveillance footage (Fig. 2). In reviewing both sets of footage, I observed that the individual at Shalom Park and the SUBJECT at the airport are of similar height, build, and posture. The black beanie, black boots, and dark pants worn by the SUBJECT at the airport are consistent in color and style with those worn by the SUBJECT in the Shalom Park surveillance video. Airport employee access logs show the SUBJECT's last secure badge swipe that evening was at approximately 10:48 P.M. Subsequently, Charlotte Douglas International Airport security records show the SUBJECT VEHICLE departing the employee parking lot at 11:13 P.M. without a detectable license plate. Based on my training and experience, individuals who intend to engage in criminal activity will sometimes deliberately cover, alter, or remove their vehicle's license plate to hinder identification by victims, witnesses, and law enforcement. Obscuring the plate reduces the effectiveness of surveillance cameras, automatic license plate readers, and traffic enforcement systems, and is intended to prevent law enforcement officers from quickly linking the vehicle to its registered owner. This type of conduct is commonly associated with attempts to avoid detection before, during, and after the commission of a crime.



Fig. 7

20. Open-source mapping tools indicate that typical vehicle travel time from Charlotte Douglas International Airport to the Foundation of Shalom Park is approximately 22 minutes, which is consistent with the time between the SUBJECT's last badge swipe and the appearance of the SUBJECT VEHICLE near the Foundation of Shalom Park, at approximately 11:35 P.M. (*see* paragraph 11).

21. South Carolina DMV records showed that MULLIS's driver's license and vehicle were registered to 480 Ponderosa Drive, Fort Mill, SC – a different address. However, information obtained from Customs and Border Protection indicated that MULLIS had received a package at 305 Fort Mill Hwy, Indian Land, SC, 29707. Additional information obtained from the U.S. Postal Inspection Service (USPIS) for both addresses showed that between October 2025 and March 2026, MULLIS only received parcels at 305 Fort Mill Hwy, Indian Land, SC, 29707, that is, his residence. The investigation revealed that the other address, 480 Ponderosa Drive, is occupied by members of MULLIS's family.

22. Additional FBI investigation confirmed that MULLIS resides at 305 Fort Mill Hwy. For example, on six different days, a white Toyota Tacoma with a bed cover matching the SUBJECT VEHICLE, registered to MULLIS (Fig. 8), was seen parked behind a privacy fence at 305 Fort Mill Hwy. On two of those days, FBI personnel observed MULLIS leave the residence in that vehicle and proceed directly to the Charlotte Douglas International Airport employee parking lot, and the was confirmed to be MULLIS's 2013 Toyota Tacoma (SC TAG "UAC887"), *i.e.* the SUBJECT VEHICLE. MULLIS and his associated vehicle were never observed at 480 Ponderosa Dr during the investigation.



Fig. 8

23. On April 16, 2026, U.S. Magistrate Judge W. Carleton Metcalf of the Western District of North Carolina signed a search warrant to obtain cellular records for AT&T phone number 704-593-8143,[3] associated with the SUBJECT's phone. AT&T provided those records to the FBI on April 27, 2026. The records were reviewed by a member of the FBI Cellular Analysis Survey Team (CAST), who determined the general area that the phone was located in at various

[3] *See* In the Matter of the Search of Information Assoc. with the Device Assigned Call No. (704) 593-8143 That is Stored at Premises Controlled by AT&T, No. 3:26-mj-00066-WCM (W.D.N.C. Apr. 16, 2026) (under seal).

times. The following is a summary of relevant activity of the phone, including its general location at the approximate times listed:

a. 1/19/2026, 11:15 PM - General area around intersection of Billy Graham Parkway and Boyer Street;

b. 1/19/2026, 11:15 PM to 11:35 PM - Travel in generally southeast direction;

c. 1/19/2026, 11:35 PM to 11:54 PM - General area around Shalom Park;

d. 1/19/2026, 11:55 PM to 1/20/2026, 12:24 AM - Travel in generally south direction;

e. 1/20/2026, 12:24 AM throughout most of 1/20/2026 - General area around 305 Fort Mill Hwy, Indian Land, SC 29707, MULLIS's residence.

24. The location of the SUBJECT's phone is consistent with the known travel of the Subject's vehicle (referenced in paragraphs 11-13, and 21), where the SUBJECT VEHICLE left the Charlotte Douglas International Airport and proceeded to Shalom Park.

25. On review of the report furnished by FBI CAST with regard to cellular data obtained from MULLIS's phone and the associated CDOT cameras, MULLIS arrived at the area of Shalom Park and approximately 11:35PM on January 19, 2026, and departed that area at 11:59 PM and returned to the area around MULLIS's residence around 12:30 A.M. on January 20, 2026. The distance from Shalom Park to 305 Fort Mill Hwy is roughly 15 miles, and would take an estimated 30 minutes, which is consistent with the time that MULLIS's phone settled in the area of MULLIS's residence (referenced in paragraph 20).

26. Business records provided by Founders Federal Credit Union indicate that MULLIS made a $59.31 transaction at Walmart on January 19, 2026. This Walmart is approximately 1.4 miles from MULLIS's residence, located at 10048 Charlotte Hwy, Indian Land,

SC 29707. Purchase receipt and surveillance footage of that transaction indicates that at approximately 10:16 A.M., MULLIS and an unidentified female were observed purchasing a number of items, including a yellow and black striped Duck tape (Fig. 9). Figure 9 matches the description of the tape that was used to affix the flyers to Shalom Park on January 19, 2026 (Fig. 1).




Fig. 9

27. Based on the preceding paragraphs, I have probable cause to believe that MULLIS's primary residence is the property located at 305 Fort Mill Hwy, Indian Land, SC, 29707. For context, 305 Fort Mill Hwy is described as a 1204 square foot residence that has two distinct and separate portions. One portion of the dwelling is used as a hair salon, and the second portion is the residence used by MULLIS. MULLIS parks his vehicle around the side of the dwelling, behind the privacy fence, and likely utilizes the side entrance near where he parks his vehicle.

B. Probable Cause to Search and Seize Electronic devices

28. Based on my training and experience I know that subjects frequently use their cellular telephones, tablets, and computers to conduct internet research, coordinate transportation,

navigate to and from the target location, draft documents, and communicate with associates. These activities typically result in the generation of historical location information—such as GPS based search data, and other location records—maintained on the subject's devices and account.

29. In this case, MULLIS was observed carrying and using a cellular device during the commission of the Subject Offense at Shalom Park, and MULLIS's phone has already been shown to have been present in the area of Shalom Park at the time of the Subject Offense. Accordingly, I have probable cause to believe that historical location information, including GPS based or GPS derived records associated with MULLIS's phone, will likely contain additional evidence relating to the Subject Offense and MULLIS's movements before, during, and after the commission of the crime.

30. It is also probable that MULLIS's device will contain different accounts (such as Telegram) that are used to communicate with associates. On January 10, 2026, a Telegram handle "TerrorVox," believed by the FBI to be MULLIS for reasons discussed below, posted on Fash Front:[4] "Southern Front is a National Socialist \ Accelerationist group based in the Southeastern States. The main goal of posting here on Fash Front is networking not recruitment, Southern Front does have a Telegram channel for publicity and spreading awareness. Feel free to ask questions or reach out" (Fig. 10). MULLIS described Southern Front as group inspired by the Atomwaffen Division.[5] MULLIS stated, "we are not trying to copy [AWD], merely learning from their mistakes and success."

---

[4] Fash Front is a neo-Fascist and neo-Nazi web forum that encompasses multiple racially or ethnically motivate violent extremism (REMVE) sub-ideologies but predominately focuses on promoting violent accelerationist tactics to achieve REMVE objectives.

[5] Atomwaffen Division is a violent neo-Nazi extremist organization founded in the U.S. around 2015, known for its white supremacist, accelerationist ideology and involvement in multiple acts of violence.




Fig. 10

31. On January 18, 2026, MULLIS, utilizing the moniker "TerrorVox," posted artwork on Fash Front with the text, "Free Use Poster Art, Designed by TerrorVox (me)" (Fig. 11). The artwork is nearly identical to the flyer that was affixed to numerous locations at the Foundation of Shalom Park on January 19, 2026 (see Fig. 1, referenced in ¶ 7, *supra*).

---

Their Co-Founder, Brandon Russell, helped establish its structure and early online presence. Russell was later arrested and convicted on federal explosives charges in 2017.




Fig. 11

32. The FBI was able to access a publicly available Southern Front Telegram Channel. The FBI was able to review the channel and was able to capture some of the messages publicly available. The following images are examples and not an exhaustive list of the content on Southern Front's Telegram Channel.

33. On January 3, 2026, Southern Front posted on their Telegram channel a detailed summary of the "Founding" of Southern Front (Fig.12). The post states [sic throughout]: "We strive to be prepared and vigilant for the foreign Kike and domestic Goyim threats that plot the destruction of our future, As the Union is slowly crumbling we look towards our own Dixieland, with our Southern values mixed with national Socialist ideals *we advocate for a white southern*

*ethnostate and the complete elimination of the influence of the Synagogue of Satan*" (emphasis added). I know from my training and experience that "kike" is an antisemitic slur often directed at Jewish people. The origin story of Southern Front posted on their Telegram Channel is consistent with and resembles MULLIS's posts under the handle TerrorVox, posted on Fash Front, dated January 10, 2026.




Fig. 12

34. On January 8, 2026, Southern Front's Telegram channel posted an image of the President of the United States, Donald Trump, wearing a ski mask, and the phrase "Rape All Jews" (Fig.13).




Fig. 13

35. On January 20, 2026, at approximately 1:46 A.M., Southern Front posted on their Telegram Channel: "oops...One of our members left something at a Jewish Community Center!" Within the post it claims it was in "Charlotte, North Carolina," including an image of the flyer left

at the Shalom Park posted on what appears to be a glass door (Fig. 14). CCTV Footage from Shalom Park was able to capture MULLIS, appearing to use a device to take photographs of the flyer on the door (*see* Fig. 4, referenced in ¶ 9, *supra*).




Fig. 14

36. Within Telegram Channel White Freedom Network on an unknown date, an unidentified user asks MULLIS whether the linked account https://t.me/SouthernFront is MULLIS's group. MULLIS responds on Telegram, using the TerrorVox account, by stating "Yes?" (Fig. 15). The FBI was able to utilize an open-source research tool that enables users to

identify previous usernames and display names with associated User IDs. The usernames TerrorVox lists are: "@TerrorVox, @CainSillum, and @DR_Sillum" and the old usernames that are listed are: "DR_MULLIS, @LR_Sillum, @Lux_V_Sillum, and @Anpp_USA" (Fig. 16). "Sillum," which appears in several of these handles, is "MULLIS" spelled backwards, and handles such as "DR_MULLIS" and "@DR_Sillum" appear to be references to MULLIS's initials for "Dalton Ray."




Fig. 15




Fig. 16

37. Based on my training and experience, subjects utilize the same username or variations of that username across numerous platforms to maintain a consistent identity, promote cross-platform presence, and signal continuity to other users. That username enables them to build a recognizable persona, which over time can carry reputation, style and/or credibility across numerous communities. Furthermore, in online communities, a consistent username helps others recognize that it's the same person participating across different discussions or platforms. I know users of various social media platforms will use similar or the same usernames or display names so associates can quickly recognize them across multiple platforms. In my training and experience, I know some social media users will use parts of their true name or initials in their display name. Based on the foregoing, the user of Fash Front account "TerrorVox" is likely the same user of the Telegram account "Southern Front."

38. On February 3, 2026, Southern Front's Telegram channel posted an image of a Nazi Solider with a firearm pointed at what appears to be a depiction of Alex Pretti wearing a "Make America Great Again" hat, posed in front of an image an American flag with the stars replaced by Stars of David emblazoned with "Jude," reminiscent of the identifying patches imposed on Jewish communities in Nazi-occupied Europe before and during World War II (Fig. 17).




Fig. 17

39. On February 15, 2026, Southern Front's Telegram channel posted an image with the title "Revolution and Legality." The picture contains a firearm round, Southern Front's Logo

and the following message: "… The key to success in the struggle ahead is self-discipline while it is the time to be 'legal' we must stolidly endure whatever the State sees fit to inflict upon us. When it is time to revolt, we must be prepared to unleash the Furies of hell on the state until it yields" (Fig.18).




Fig. 18

40. On February 18, 2026, Southern Front posted on their Telegram Channel an image of a skull with the phrase: "The only thing they understand Political Terror National Socialist

Revolution" with a link to Southern Front's recruitment email (Fig. 19). The picture has a caption that states: "The future belongs to the few of us still willing to get our hands dirty."




Fig. 19

41. Through open-source research, the FBI was also able to locate TerrorVox's publicly available X.com (formerly Twitter) account. The FBI was able to review the account and was able to capture some of the messages. The following images are examples and not an exhaustive list of the content on TerrorVox's X Account. Business records provided by X (formerly Twitter) indicate the user of the X Username: "TerrorVox" to be registered to telephone

number +1 704-593-8413 and the email address cainsillum@proton.me. The registered phone number to X matches the Subject's Phone.

42. On April 20, 2026, MULLIS posted on X an image of an individual wearing a dark hoodie, a ski mask, and a handgun. The background of the picture contains Nazi symbols, and the picture contained a caption "SOUTHERN FRONT JOIN YOUR LOCAL NAZI" (Fig 20).




Fig. 20

44. Based on the foregoing, and my training and experience, the FBI assesses that MULLIS is the owner and operator of Fash Front Account "TerrorVox", Telegram Account "TerrorVox", as well as the Telegram Channel "Southern Front", and the X Account "TerrorVox." Furthermore, based on the similarities of posts and imagery containing the *Sturmabteilung*[6] logo,

---

[6] The Sturmabteilung (SA), also known as the Storm division or stormtroopers, was the early paramilitary arm of the Nazi Party, responsible for protecting party events and confronting political opponents during the 1920s and early 1930s. It grew rapidly in size and visibility, becoming a major tool of intimidation and street violence in the lead-up to Hitler's rise to power.

and picture of a skull in Figure 1 and 19, it further corroborates that MULLIS is the likely owner and operator of the aforementioned social media accounts.

C. Background Regarding Telegram and Electronic Devices

45. Telegram is a free online platform offering several services, including instant messaging and voice-over-IP services that allow users to send text and voice messages, make voice and video calls, and share images, documents, and other content using secure end-to-end encryption, which it calls "Secret Chat." Telegram also has social networking features, allowing users to post stories and create large public groups with up to 200,000 members. Users can find and join Telegram groups for a variety of topics by either clicking on an invitation link sent to them or by seeking out and joining a specific group.

46. Telegram users are assigned a user ID that is specific to them and cannot be changed, only deleted. Even if a user changes their telephone number, the user ID will remain unchanged, allowing that user to login to Telegram using the user ID. A user can change their public-facing username, but the user ID will remain the same.

47. Telegram's architecture (by design) prevents meaningful usable data production in response to legal process because messages are end-to-end encrypted and the content of these messages are not stored on Telegram's servers. Moreover, I know based on my training and experience and information provided by Telegram to federal law enforcement that Telegram is headquartered in the British Virgin Islands, and claims that it uses a "distributed infrastructure" that stores messages and decryption keys under the control of dispersed group of entities in different, unspecified jurisdictions, requiring several court orders from different jurisdictions in order to obtain the content and associated metadata of Secret Chats. As a result, even a properly issued search warrant served on Telegram will not necessarily yield message content or other

locally stored data. Typically, Telegram will only provide IP address information and the registered phone number for an account after receiving a legal demand. Obtaining access to the physical device used by a subject is therefore often the most effective and reliable method to retrieve Telegram communications and associated evidence used in furtherance of criminal activity.

48. Based on my training and experience, if a Telegram user logs into his or her Telegram account from a new device, all the user's previous activity on Telegram, including chats and messages in groups, are available on the new device if the user did not previously delete it. MULLIS's use of Telegram to post photos regarding the offense under investigation and to communicate with potential co-conspirators through the Southern Front channel therefore provides further probable cause to physically search MULLIS's electronic devices located in the SUBJECT VEHICLE, and on his person, in the manner set forth in this Affidavit.

49. Based on my training and experience, there is probable cause to believe that located in the SUBJECT VEHICLE, and/or the person of MULLIS will be one or more electronic devices, to include smart phones, tablets, and/or personal computers, used by MULLIS to access the above referenced social media accounts, including Telegram, to post images related to the Subject Offense. There is also probable cause to believe that these electronic devices were used to draft the antisemitic flyers (referenced in paragraph 7, Fig. 1), and that drafts or the final version of the antisemitic flyer will be located in these devices, as well as communications with associates discussing the creation and placement of these flyers. It is also probable that the printer utilized to print the flyers will be present inside MULLIS's residence, and that evidence of the prints will likely be present inside of the memory of the printer. I also know that individuals commonly use

external drives such as SD Cards, USB drives, and external hard drives to store copies of photographs or other digital files.

50. As such, this Application seeks authority to search and seize all electronic devices or external storage devices located on MULLIS and in the SUBJECT VEHICLE at the time of execution of the Warrant, and for the copying or imaging of electronically stored information. Alternately, if it is not feasible to complete the copying of such information on the day of execution of the warrant, this Application seeks authorization for the seizure of the electronic devices for a reasonable amount of time, for the sole purpose of completing the copying or imaging process, all under Fed. R. Crim. P. 41(e)(2)(B).

51. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of electronic devices, generally, I respectfully submit that if electronic devices are found on MULLIS or in the SUBJECT VEHICLE, there is probable cause to believe that the items described in Attachments B-1 and B-2 may be stored in the device(s), for at least the following reasons:

a. Individuals who engage in the above-described criminal activity including intentionally damaging religious property or obstruction of persons in the free exercise of religious beliefs, often tend to maintain documents, photos, videos, and records relating to their illegal activity for extended periods, which can include text or other "Short Message Service" ("SMS") messages; multimedia messages, and call logs to include telephone numbers; email addresses, identifiers for instant messaging and social medial accounts.

b. In modern American culture, most individuals possess multiple devices that have the ability to connect to the Internet (*e.g.*, tablets, desktop computers, laptop

computers, and mobile phones). With respect to mobile devices, generally, it is well-known that virtually all adults in the United States use mobile electronic devices. In a fact sheet from April 2021, the Pew Research Center for Internet & Technology estimated that 97% of Americans owned at least one cellular phone, and that that same 2021 report estimated that 85% of Americans use at least one smartphone. The report also reflects that about three-quarters of U.S. adults now own a desktop or laptop computer, while roughly half own a tablet computer. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited October 25, 2022).

c. Many individuals also keep prior versions of their devices (*e.g.*, prior cell phones and prior computers). This is the case because (1) individuals are often reluctant to discard devices that frequently contain significant personal information and (2) current devices may malfunction, and prior versions can often be used until the current device is repaired or replaced. Additionally, individuals who engage in the foregoing criminal activity, in the event that they change electronic devices, will often "back up" or transfer files from their old electronic devices to that of their new electronic devices, so as not to lose data, which would be valuable in facilitating their criminal activity. In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss. Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.

d. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Additionally, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files,

and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a electronic device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other electronic device habits.

52. As further described in Attachments B-1 and B-2, this Application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the Subject Offense, but also for forensic electronic evidence or information that establishes how the electronic device(s) were used, the purpose of their use, who used them, and when.

53. There is probable cause to believe that this forensic electronic evidence will be on any of the devices located on MULLIS and in the SUBJECT VEHICLE because:

a. Although some of the records called for by this Warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), electronic devices can contain other forms of electronic evidence as well. In particular, records of how a electronic device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the electronic device(s) are, as described further in the attachments, called for by this Warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such

as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active or used. Web browsers, e-mail programs, and chat programs often store configuration information on the storage medium such as a hard drive, flash drive, memory card, or memory chip, that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer, smart phone, or other electronic device was in use. Computer, smart phone, and other electronic device file systems can record information about the dates files were created and the sequence in which they were created although this information can later be falsified. Nonetheless, this data can be evidence of a crime, indicate the identity of the user of the electronic device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment and also can require substantial time.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a electronic device (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has

used or controlled the electronic device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of anti-virus, spyware, and malware detection programs, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the electronic device at a relevant time, and potentially who did not. It may also indicate whether a computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, information and data pertaining to device activity can indicate how and when the device was accessed or used. For example, as described herein, computers typically contain information that logs computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of device access, use, and events relating to the crime under investigation. Additionally, some information stored within a electronic device may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer or personal electronic device may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also

indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the device user. Last, information stored within a device may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within the device may indicate the owner or user's motive and intent to commit a crime (*e.g.*, Internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a device works can, after examining this forensic evidence in its proper context, draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the Warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and identity of the user.

## METHODS TO BE USED TO SEARCH ELECTRONIC DEVICES

54. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of electronic devices, I know that:

a. Searching electronic devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of electronic devices and software programs in use today. Electronic devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of electronic devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching electronic devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover

"hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from electronic devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on electronic devices.

c. Further, as discussed above, evidence of how a electronic device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a electronic device. For example, to rebut a claim that the owner of a electronic device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the electronic device remotely is not present on the electronic device. Evidence of the absence of particular data or software on a electronic device is not segregable from the electronic device itself. Analysis of the electronic device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d. Electronic device users can attempt to conceal data within electronic devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Electronic device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into

readable form. Electronic device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other electronic devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, electronic device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a electronic device user can conceal text in an image file that cannot be viewed when the image file is opened. Electronic devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e. Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user

information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f. Based on all of the foregoing, I respectfully submit that searching any electronic device for the information, records, or evidence pursuant to this Warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your Affiant requests

permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this Warrant.

55. The volume of data stored on many electronic devices will typically be so large that it will be extremely impractical to search for data during the physical search of MULLIS and the SUBJECT VEHICLE.

56. Therefore, in searching for information, records, or evidence, further described in Attachments B-1 and B-2, law enforcement personnel executing this Search Warrant will employ the following procedures:

a. Upon securing MULLIS and the SUBJECT VEHICLE, law enforcement personnel will, consistent with Fed. R. Crim. P. 41(e)(2)(B), seize any electronic devices within the scope of this Warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachments B-1 and B-2 and will assess the electronic devices and attempt to conduct an appropriate search of any such electronic devices, and to make an exact copy of the dataset by methods including "mirroring," while with MULLIS and at the SUBJECT VEHICLE, if law enforcement personnel deem it feasible and safe to do so. For all the reasons described above, however, it may not be feasible to conduct a complete, safe, and appropriate search of any such electronic devices with MULLIS and at the SUBJECT VEHICLE. If law enforcement personnel make such a determination, it will transport these items to an appropriate law enforcement laboratory or similar facility for review.

b. The electronic devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachments B-1 and B-2.

c. The analysis of the contents of the electronic devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

d. In searching the electronic devices, the forensic examiners may examine as much of the contents of the electronic devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachments B-1 and B-2. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachments

B-1 and B-2. Any search techniques or protocols used in searching the contents of the seized electronic devices will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC ACCESS TO DEVICES

57. This Warrant permits law enforcement agents to obtain the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) requiring such biometric access subject to seizure pursuant to this Warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the device(s). The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is

found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

58. As discussed in this Affidavit, your Affiant has reason to believe that one or more electronic devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this Warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this Warrant.

59. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric

features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

60. Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this Warrant and may be unlocked using one of the aforementioned biometric features, this Warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s) found on MULLIS and in the SUBJECT VEHICLE; (2) hold the device(s) found on MULLIS and in the SUBJECT VEHICLE in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) found on MULLIS and in the SUBJECT VEHICLE in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this Warrant.

61. The proposed Warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device(s). Nor does the proposed Warrant authorize law enforcement to use the fact that the Warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed Warrant. To avoid confusion on that point, if agents in executing the Warrant ask any of the aforementioned person(s) for the password to any

device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the Warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

61. Based on the aforementioned facts and circumstances, and in light of my training and experience, I submit that there is probable cause to believe that Dalton Ray MULLIS committed violations of Title 18, United States Code, Section 247(c). I am seeking this warrant to search the property described in Attachments A-1 and A-2, and seize the items described in Attachments B-1 and B-2. It is possible that due to operational concerns MULLIS may be arrested away from his dwelling, in that event I also seek the authority to search the SUBJECT VEHICLE at a location that could be separate from the main dwelling to be searched. This secondary location would likely be at the Charlotte Douglas International Airport or its related employee parking lot, within the Western District of North Carolina.

[Remainder of page intentionally left blank.]

## CONCLUSION

62. Based on the investigation described above, probable cause exists to believe that contraband and evidence of violations of 18 U.S.C. § 247(c), which prohibits intentionally damaging religious property; and obstruction of persons in the free exercise of religious beliefs will be found on the properties described in Attachments A-1 and A-2.

63. I, therefore, respectfully request that the attached warrant be issued authorizing the search of the locations described in Attachments A-1 and A-2 for the items listed in Attachments B-1 and B-2. I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

John Ryan Anthony, Special Agent
Federal Bureau of Investigation

*This Affidavit was reviewed by AUSA Dallas J.E. Kaplan.*

Subscribed to and sworn before me this 10th day of June, 2026.

Signature Line
Title of Signing Officer
United States District Court

# ATTACHMENT A-1
# PLACE TO BE SEARCHED

**2013 Toyota Tacoma VIN 5TFNX4CN0DX026479 South Carolina Registration "UAC887"**

The following photograph is the "TARGET VEHICLE," typically located in the vicinity of 305 Fort Mill Hwy, Indian Land, SC, 29707, within the District of South Carolina. The vehicle may also be located at the Charlotte Douglas International Airport Employee Parking lot, within the Western District of North Carolina.



## ATTACHMENT A-2
## PLACE TO BE SEARCHED

**Person of Dalton Ray Mullis**

The person to be searched is DALTON RAY MULLIS (the "Subject" or "MULLIS") (date of birth 2/26/2002) as pictured below, provided that such person is located within the Western District of North Carolina or the District of South Carolina:



## ATTACHMENTS B-1 AND B-2
## PARTICULAR THINGS TO BE SEIZED

This Affidavit is made in support of this Application to seize the following items of evidence regarding violations of 18 U.S.C. § 247, damage to religious property; obstruction of persons in the free exercise of religious beliefs by Dalton MULLIS:

1. Electronic devices, including computers and storage media, that could be used as a means to commit the violations described above, and on which the things described in this Warrant could be stored.
2. Routers, modems, and network equipment used to connect computers to the Internet.
3. Records, information, and items relating to violations of the statutes described above in the form of:
   a. records and information referencing damage to religious property or obstruction of persons in the free exercise of religious beliefs;
   b. records, information, and items referencing or revealing the occupancy or ownership of 305 Fort Mill Hwy, Indian Land, South Carolina, including utility and telephone bills, mail envelopes, or addressed correspondence;
   c. records and information referencing or revealing the use of peer-to-peer software, including BitTorrent client software;
   d. records and information revealing communications with associates in reference to damage to religious property or obstruction of persons in the free exercise of religious beliefs, including for the purposes of planning, financing, coordinating, or furthering the same;
   e. records and information revealing the use and identification of remote computing services such as email accounts or cloud storage; and

f. evidence relating to the identity and location of any confederates or co-conspirators in the commission of the offense under investigation.

4. For any electronic device whose seizure is otherwise authorized by this Warrant, and any electronic device that contains or in which is stored records or information that is otherwise called for by this Warrant (hereinafter, "DEVICE"):

   a. evidence of who used, owned, or controlled the DEVICE at the time the things described in this Warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the DEVICE of other storage devices or similar containers for electronic evidence;

   e. evidence of programs (and associated data) that are designed to eliminate data from the DEVICE;

   f. passwords, encryption keys, and other access devices that may be necessary to access the DEVICE;

   g. documentation and manuals that may be necessary to access the DEVICE or to conduct a forensic examination of the DEVICE;

h. records of or information about Internet Protocol addresses used by the DEVICE;

i. records of or information about the DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

5. During the course of the search, photographs of the searched property may be taken to record the condition thereof and/or the location of items therein.

6. Yellow and black "Duck" tape

7. Black sock cap/beanie with white emblem on the front brim

8. Black jacket/ quarter-zip sweater with lighter colored writing across the back at shoulder blade height, with some form of lighter colored writing or zipper on the front left-breast

9. Evidence of intent to commit the offense under investigation, including but not limited to:

   a. communications or writings relating to intentionally damaging religious property or obstruction of persons in the free exercise of religious beliefs;

   b. evidence of searches for or purchases of items that could be used in the commission of intentionally damaging religious property or obstruction of persons in the free exercise of religious beliefs;

   c. Notes, journals, flyers, posters, books or other writings mentioning Southern Front, Fash Front, other items with symbols synonymous with Nazism or antisemitism

10. Cameras, memory cards (SD cards / "memory sticks") which may constitute evidence or instrumentalities of the offense under investigation.

11. Printers which may constitute evidence or instrumentalities of the offense under investigation.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "electronic device" or "device" refers to any computer, digital storage media, or computer hardware.

The term "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, specifically, "computers" are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

The term "digital storage media" means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

The term "computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including,

but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

This Warrant authorizes a review of electronic devices and electronically stored information seized or copied pursuant to this Warrant in order to locate evidence, fruits, and instrumentalities described in this Warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this Warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the person of MULLIS and the SUBJECT VEHICLE described in Attachments A-1 and A-2, law enforcement personnel are also specifically authorized to obtain the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any electronic device(s) requiring such biometric access subject to seizure pursuant to this Warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

(a) any of the electronic device(s) found on MULLIS and in the SUBJECT VEHICLE,

(b) where the electronic device(s) are limited to those which are capable of containing and reasonably could contain evidence, information, or instrumentalities of the offense(s) as described in the Search Warrant Affidavit and warrant attachments, for the purpose of attempting to unlock the device(s)'s security features in order to search the contents as authorized by this Warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this Warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the device(s). Nor does the Warrant authorize law enforcement to use the fact that the Warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the Warrant ask any of the aforementioned person(s) for the password to any device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any device(s), the agents will not state or otherwise imply that the Warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

If the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review and notify the Court. If appropriate, the government will seek the Court's approval of a Filter Team procedure. Should the Court approve the Filter Team procedure, the

Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team, and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (*e.g.,* the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. Absent unusual circumstances, the government will provide the putatively protected documents to the privilege holder if and when they are provided to the Court for further action. If possible, government attorneys will engage with the privilege holder to resolve privilege determinations before proceeding to the Court for judicial review.